PER CURIAM.
The Attorney General has requested this Court review proposed amendments to the Florida Constitution. We have jurisdiction. Art. IV, § 10; art. V, § 3(b)(10), Fla. Const. For the reasons expressed below, we hold the four proposed amendments violate article XI, section 3, Florida Constitution, and section 101.161, Florida Statutes (1999). Accordingly, the proposed amendments should not be placed on the ballot.
In accordance with article XI, section 3, Florida Constitution,[1] the Florida Civil *889 Rights Initiative, the sponsor of the proposed state constitutional amendments, filed initiative petitions with the Secretary of State. On October 26, 1999, the Secretary of State submitted the initiative petitions to the Attorney General pursuant to section 15.21, Florida Statutes (1999).[2] In compliance with section 16.061, Florida Statutes (1999), the Attorney General subsequently petitioned this Court for an advisory opinion regarding the validity of the proposed constitutional amendments.[3] Thereafter, this Court issued an interlocutory order inviting interested parties to file briefs in this case. In response to the Court’s order, the following groups filed briefs as interested parties: Florida Civil Rights Initiative (FCRI), Leadership Conference on Civil Rights (Leadership Conference), Florida Conference of Black State Legislators (CBSL), Florida Board of Regents (Board of Regents), Campaign for a Colorblind America, Initiative & Referendum Institute and Pacific Legal Foundation (CCBA), Florida Chapter of the National Bar Association (NBA), and Floridians Representing Equity and Equality (FREE).
Generally, the four initiative petitions address alleged discriminatory practices in the areas of public education, employment, and contracting. The first three proposed amendments purport to bar differential treatment based on race, color, ethnicity, and national origin, and are identical in every respect except the designation of the targeted area of discrimination. For example, the first petition addresses education, the second petition addresses employment, and the third petition addresses contracting. The first three proposed amendments state:
ADD SECTION 26 TO ARTICLE I, FLORIDA CONSTITUTION AS FOLLOWS:
(1) The state shall not treat persons differently based on race, color, ethnicity, or national origin in the operation of public education.
(2) This section applies only to action taken after the effective date of this section.
(3) This section does not affect any law or governmental action that does not treat persons differently based on the person’s race, color, ethnicity, or national origin.
(4) This section does not invalidate any court order or consent decree that is in force as of the effective date of this section.
(5) This section does not prohibit action that must be taken to establish or maintain eligibility for any federal program, if ineligibility would result in a loss of federal funds to the state.
(6) For the purposes of this section, “state” includes, but is not necessarily limited to, the state itself, any city, county, district, public college or university, *890 or other political subdivision or governmental instrumentality of or within the state.
(7) The remedies available for violations of this section shall be the same, regardless of the injured party’s race, color, ethnicity, or national origin, as are otherwise available for violations of then existing Florida education discrimination law.
(8) This section shall be self-executing. If any part or parts of this section are found to be in conflict with federal law or the United States Constitution, the section shall be implemented to the maximum extent that federal law and the United States Constitution permit. Any provision held invalid shall be severable from the remaining portions of this section.
The ballot titles for the proposed amendments state: “AMENDMENT TO BAR GOVERNMENT FROM TREATING PEOPLE DIFFERENTLY BASED ON RACE IN PUBLIC EDUCATION.” As previously mentioned, the titles for the proposed amendments for employment and contracting are identical except they replace “public education” with “public employment” and “public contracting,” respectively. The summaries for the proposed amendments provide:
Amends Declaration of Rights, Article I of the Florida Constitution, to bar state and local government bodies from treating people differently based on race, col- or, ethnicity, or national origin in the operation of public education [public employment] [public contracting], whether the program is called “preferential treatment,” “affirmative action,” or anything else. Does not bar programs that treat people equally without regard to race, color, ethnicity, or national origin. Exempts actions needed for federal funds eligibility.
The fourth petition also purports to prohibit discrimination on the aforementioned bases, but also allegedly proscribes differential treatment based on sex. Furthermore, the fourth petition purports in one petition to bar differential treatment in the three areas, education, employment, and contracting, instead of addressing these areas in separate petitions. The fourth proposed amendment contains the same provisions as the first three, except it contains an additional section which states:
This section does not affect any otherwise lawful classification that: (a) Is based on sex and is necessary for sexual privacy or medical or psychological treatment; or (b) Is necessary for undercover law enforcement or for film, video, audio, or theatrical casting; or (c) Provides for separate athletic teams for each sex.
The ballot title for the fourth petition is also slightly different, stating “END GOVERNMENTAL DISCRIMINATION AND PREFERENCES AMENDMENT.” The summary for the fourth petition provides:
Amends Declaration of Rights, Article I of Florida Constitution, to bar government from treating people differently based on race, sex, color, ethnicity, or national origin in public education, employment, or contracting, whether the program • is called “preferential treatment,” “affirmative action,” or anything else. Does not bar programs that treat people equally without regard to race, sex, color, ethnicity, or national origin. Exempts bona fide qualifications based on sex and actions needed for federal funds eligibility.
The Court’s inquiry, when determining the validity of initiative petitions, is limited to two legal issues: whether the petition satisfies the single-subject requirement of article XI, section 3, Florida Constitution, and whether the ballot titles and summaries are printed in clear and unambiguous language pursuant to section 101.161, Florida Statutes (1999). See Advisory Opinion to the Attorney General re Right of Citizens to Choose Health Care Providers, 705 So.2d 563, 565 (Fla.1998); Advisory *891 Opinion to the Attorney General re Prohibiting Public Funding of Political Candidates’ Campaigns, 693 So.2d 972, 974 (Fla.1997). In order for the Court to invalidate a proposed amendment, the record must show that the proposal is clearly and conclusively defective on either ground. See Askew v. Firestone, 421 So.2d 151, 154 (Fla.1982). In determining the propriety of the initiative petitions, the Court does not review the merits of the proposed amendments. See Right of Citizens to Choose Health Care Providers, 705 So.2d at 565; Advisory Opinion to the Attorney General re People’s Property Rights Amendments Providing Compensation for Restricting Real Property Use May Cover Multiple Subjects, 699 So.2d 1304, 1306 (Fla.1997). As the Court noted in Advisory Opinion to the Attorney General re Tax Limitation, 644 So.2d 486, 489 (Fla.1994) (Tax Limitation I ), “This Court’s role in these matters is strictly limited to the legal issues presented by the constitution and relevant statutes. This Court does not have the authority or responsibility to rule on the merits or the wisdom of these proposed initiative amendments .... ” Moreover, other constitutional challenges are not justiciable in this type of proceeding. See Advisory Opinion to the Attorney General — Limited Political Terms in Certain Elective Offices, 592 So.2d 225, 227 (Fla.1991).
The restrictions on initiative petitions are both constitutionally and statutorily mandated. The single-subject requirement is derived from article XI, section 3, which provides, in relevant part:
The power to propose the revision or amendment of any portion of this constitution by initiative is reserved to the people, provided that, any such revision or amendment, except for those limiting the power of government to raise revenue, shall embrace but one subject and matter directly connected therewith.
Art. XI, § 3, Fla. Const, (emphasis added). Although article XI provides other methods for amending or revising the constitution,[4] the citizen initiative is the only method that is constrained by the single-subject requirement. See Advisory Opinion to the Attorney General re Fish and Wildlife Conservation Comm’n, 705 So.2d 1351, 1353 (Fla.1998). The single-subject limitation exists because the initiative process does not provide the opportunity for public hearing and debate that accompanies the other methods of proposing amendments. See Fish and Wildlife Conservation Comm’n, 705 So.2d at 1353. Consequently, “[the] single-subject provision is a rule of restraint designed to insulate Florida’s organic law from precipitous and cataclysmic change.” In re Advisory Opinion to the Attorney General — Save Our Everglades, 636 So.2d 1336, 1339 (Fla.1994). This Court requires “strict compliance with the single-subject rule in the initiative process for constitutional change because our constitution is the basic document that controls our governmental functions, including the adoption of any laws by the legislature.” Fine v. Firestone, 448 So.2d 984, 989 (Fla.1984). The single-subject requirement also prevents logrolling, a practice that combines separate issues into a single proposal to secure passage of an unpopular issue. See Fish and Wildlife Conservation Comm’n, 705 So.2d at 1353; People’s Property Rights Amendments, 699 So.2d at 1307; Save Our Everglades, 636 So.2d at 1339. Thus, voters are protected by the single-subject requirement because they are not forced to “accept part of an initiative proposal which they oppose in order to obtain a change in the constitution which they support.” Fine, 448 So.2d at 988.
In evaluating whether a proposed amendment violates the single-subject requirement, the Court must determine *892 whether it has a “logical and natural oneness of purpose.” Advisory Opinion to the Attorney General re Term Limits Pledge, 718 So.2d 798, 802 (Fla.1998) (quoting Fine, 448 So.2d at 990). To ascertain whether a “oneness of purpose” exists, the Court must consider “whether the proposal affects separate functions of government and how the proposal affects other provisions of the constitution.” People’s Property Rights Amendments, 699 So.2d at 1307; see also Term Limits Pledge, 718 So.2d at 802; Tax Limitation I, 644 So.2d at 490 (noting that “how an initiative proposal affects other articles or sections of the constitution is an appropriate factor to be considered in determining whether there is more than one subject included in an initiative proposal”) (quoting Fine, 448 So.2d at 990). However, “[a] proposal that affects several branches of government will not automatically fail; rather, it is when a proposal substantially alters or performs the functions of multiple branches that it violates the single-subject test.” Fish and Wildlife Conservation Comm’n, 705 So.2d at 1353-54. Moreover, “the possibility that an amendment might interact with other parts of the Florida Constitution is not sufficient reason to invalidate the proposed amendment.” Term Limits Pledge, 718 So.2d at 802. Nevertheless, “it is imperative that an initiative identify the provisions of the constitution substantially affected by the proposed amendment in order for the public to fully comprehend the contemplated changes and to ensure that the initiative’s effect on other unnamed provisions is not left unresolved and open to various interpretations.” Right of Citizens to Choose Health Care Providers, 705 So.2d at 565-66.
The second area of our inquiry, the need for clarity in the ballot titles and summaries, is addressed in section 101.161, Florida Statutes, which provides, in pertinent part:
Whenever a constitutional amendment or other public measure is submitted to the vote of the people, the substance of such amendment ... shall be printed in clear and unambiguous language on the ballot.... The substance of the amendment ... shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure. The ballot title shall consist of a caption, not exceeding 15 words in length, by which the measure is commonly referred to or spoken of.
§ 101.161(1), Fla.Stat. (1999). Thus, the statute requires that the ballot title and summary “state in clear and unambiguous language the chief purpose of the measure.” Limited Political Terms in Certain Elective Offices, 592 So.2d at 228 (quoting Askew, 421 So.2d at 155); accord Right of Citizens to Choose Health Care Providers, 705 So.2d at 566. Moreover, the title and summary must be accurate and informative. See Term Limits Pledge, 718 So.2d at 803. These requirements ensure that the “electorate is advised of the true meaning, and ramifications, of an amendment.” Tax Limitation I, 644 So.2d at 490 (quoting Askew, 421 So.2d at 156). Indeed, the Court concluded that the purpose of the statute was “to provide fair notice of the content of the proposed amendment so that the voter will not be misled as to its purpose, and can cast an intelligent and informed ballot.” Term Limits Pledge, 718 So.2d at 803. Nonetheless, “the title and summary need not explain every detail or ramification of the proposed amendment.” Prohibiting Public Funding of Political Candidates’ Campaigns, 693 So.2d at 975.

SINGLE-SUBJECT REQUIREMENT

The Attorney General and various opponents have asserted several arguments regarding the validity of the proposed amendments. We, however, address only those contentions which we find disposi-tive. The first challenge to the initiative petitions is that they include multiple classifications, thereby asking voters several questions in derogation of the single-subject requirement. This Court addressed the issue of including multiple classifica *893 tions in a single initiative petition in In re Advisory Opinion to the Attorney General — Restricts Lazos Related to Discrimination, 632 So.2d 1018 (Fla.1994). In that case, the proposed amendment enumerated ten classifications of people who were entitled to protection from discrimination.[5] See Restricts Laws Related to Discrimination, 632 So.2d at 1019. In invalidating the petition, we noted that the amendment’s inclusion of ten different classifications constituted logrolling and was viola-tive of the single-subject requirement. See id. at 1020. In essence, the voters were “being asked to give one ‘yes’ or ‘no’ answer to a proposal that actually asks ten questions.” Id.
As the Attorney General correctly recognizes, the omnibus petition contains the same fatal flaw by combining three distinct subjects which constitute separate and distinct functional operations of government — public education, public employment, and public contracting. FCRI, however, contends that the subject areas operate as a- limitation on the amendment’s application, thereby preventing it from having universal application to all government action.
That the proposed amendment does not universally apply to all government action does not insulate it from single-subject scrutiny. Surely the proponents of an initiative petition cannot satisfy the single-subject requirement by contending that the proposed amendment could have been even broader. Such a contention would contravene both the constitutional requirement and this Court’s repeated holdings that initiative petitions should embrace only one subject. The Court’s commitment to enforcing this standard is evidenced by Right of Citizens to Choose Health Care Providers, which recognized that the issue of health care providers presented multiple topics that constrained the electorate’s ability to vote on singular issues. Moreover, in Fine and Tax Limitation I we recognized that the subject of taxes and user fees could not be combined within a single initiative.[6] See 448 So.2d at 991, 644 So.2d at 491. Without question, the amendment combining education, employment, and contracting is significantly broader than the subjects of health care providers and taxes and user fees. It applies to diverse areas of governmental operation which, in themselves, are multifaceted. In effect, FCRI’s purported “limitation” on the application of the proposed amendment essentially creates multiple subjects. In short, the omnibus petition applies to three broadly defined subjects and, therefore, violates the single-subject requirement.
Opponents also maintain that the proposed amendments substantially affect other existing constitutional provisions. As previously stated, initiative petitions must identify those constitutional provisions that are substantially affected by the proposed amendments. See Right of Citizens to Choose Health Care Providers, 705 So.2d at 565-66. We further elucidated this “identification” requirement in Tax Limitation I. In that advisory opinion, we held that the proposed amendment .substantially affected article VII, sections 1(a), 1(b), 2, 5, 7, and 9. See 644 So.2d at 493-94. We noted that all of these constitutional provisions were included in the constitu *894 tion “for a distinct and specific purpose.” Id. at 494. In concluding that these provisions were substantially affected, we recognized that “[n]one have been identified and, consequently, this proposed initiative violates the principle we clearly established in Fine that the electorate must be advised of the effect a proposal has on existing sections of the constitution.” Id.
Likewise, the proposed amendments fail to identify the constitutional provisions that they substantially affect. Specifically, the proposed amendments substantially affect both article I, section 2, and article I, section 21. Article I, section 2, provides:
All natural persons, female and male alike, are equal before the law and have inalienable rights, among which are the right to enjoy and defend life and liberty, to pursue happiness, to be rewarded for industry, and to acquire, possess and protect property; except that the ownership, inheritance, disposition and possession of real property by aliens ineligible for citizenship may be regulated or prohibited by law. No person shall be deprived of any right because of race, religion, national origin, or physical disability.
Art. I, § 2, Fla. Const. If the electorate approves the proposed amendments, preferential treatment would be prohibited on the basis of the enumerated classifications, but permitted on the basis of religion and physical disability — the remaining classifications in the current constitutional provision. FCRI contends that the proposed amendments do not affect the existing protection against deprivation of rights. Rather, they provide an additional protection against discriminatory preferences to the existing constitutional protection against discriminatory deprivation.
FCRI’s construction of the proposed amendments’ effect on article I, section 2, is not entirely accurate. Although FCRI characterizes the changes as “additional” or “supplemental,” they nevertheless affect the existing constitutional prohibitions. For example, counsel for FCRI conceded at oral argument that the prohibition against deprivation has not previously been construed as prohibiting preferential treatment. To be sure, “affirmative action” laws and programs have been used as remedies for violations or deprivations of rights. As such, the proposed amendments alter the available remedies for an existing constitutional protection. As a result, they take away existing protections granted by article I, section 2, to those who have been victims of discrimination. As counsel for NBA suggested, the petitions engage in false advertisement because they do “not provide equal protection of the law, [they] take away the cloak of protection from victims of discrimination.” Further, the proposed amendments create new distinctions between discrimination based on the enumerated classifications and discrimination based on religion and physical disability. In short, article I, section 2, is substantially affected, yet nowhere in the petitions is the voter apprised of its new operation. Accordingly, the petitions’ failure to acknowledge the proposed amendments’ effect on article I, section 2, violates the single-subject requirement.
Additionally, the absence of a reference to article I, section 21, also renders the initiative petitions constitutionally infirm. Article I, section 21, provides: “The courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay.” Art. I, § 21, Fla. Const. The proposed amendments state: “This section does not invalidate any court order or consent decree that is in force as of the effective date of this section.” Individual Petitions § 4; Omnibus Petition § 5. By providing an exception for only existing court orders or consent decrees, the proposed amendments strip the judiciary of its powers to provide redress for injuries emanating from discriminatory practices, thereby directly impacting article I, section 21. Indeed, counsel for FCRI explicitly stated in *895 oral argument that courts would be unable to use preferences or consider race in fashioning remedies for discriminatory violations. FCRI attempts to minimize the gravity of the amendments’ impact by contending that individuals are still entitled to remedies — those provided by general law.
This argument, however, is both tautological and misleading. According to FCRI, individual victims purportedly maintain access to courts because remedies will be provided by general law. However, the proposed amendments themselves place limitations on what remedies general law may provide. The amendments require general law to limit available remedies to injunctive or prohibitive relief. These limitations on the courts’ powers are significant in that they operate to redefine the remedial role of courts in equal protection cases. As a result, courts will be closed, not open, to victims of discrimination who seek redress for their injuries. Thus, the proposed amendments have a substantial effect on article I, section 21, and the failure to identify this substantial effect violates the single-subject requirement.
The Attorney General and opponents further contend that the proposed amendments violate the single-subject requirement because of their functional effect on multiple levels and branches of government. This Court has invalidated proposed amendments on single-subject grounds repeatedly for substantially altering or performing the functions of multiple branches of government. See People’s Property Rights Amendments, 699 So.2d at 1308. As we reiterated in Evans v. Firestone, 457 So.2d 1351 (Fla.1984), the test is functional, not locational, “and where a proposed amendment changes more than one government function, it is clearly multi-subject.” 457 So.2d at 1354. In Evans, we invalidated a proposed amendment because it performed both legislative and judicial functions. See 457 So.2d at 1354. We noted that substantive provisions were essentially legislative, and that the amendment’s effect on procedural rules was judicial in nature. See id. Similarly, in People’s Property Rights Amendments, we invalidated an initiative because of its effect not only on “legislative appropriations and statutory enactments but executive enforcement and decision-making.” 699 So.2d at 1308. We further noted that the amendment was violative of the single-subject requirement because “[t]he state, special districts, and local governments have various legislative, executive, and quasi-judicial functions which are applicable to land use.” Id.
The foregoing cases illustrate the defects in the present petitions. As counsel for FCRI conceded, the Legislature will be prohibited from adopting an “affirmative or balancing program” to address unlawful deprivation of rights. In effect, the proposed amendments would eliminate the Legislature’s authority to adopt programs, create legislative bodies, or fund scholarships specifically designed for minorities. Like the amendments in Evans, these substantive constraints are essentially legislative functions. As previously discussed, the functions of the judiciary are also substantially affected. Like the procedural rule changes proposed in the Evans amendments, restricting the scope of courts’ remedial powers is inherently judicial in nature. Limiting legislative authority and redefining courts’ remedial powers significantly restricts the state’s ability to address the effects of past and present discriminatory practices. That these effects constitute substantial alterations of governmental functions is incontrovertible.
Moreover, in Tax Limitation I, we invalidated a petition that not only altered the functions of the legislative and executive branches, but had “a very distinct and substantial affect [sic] on each local governmental entity.” 644 So.2d at 494-95. Likewise, in Restricts Laws Related to Discrimination, we invalidated an amendment applying to “any governmental entity” in part because it encroached on the home rule powers of local government. *896 The FCRI initiatives have a similar effect. As previously mentioned, the proposed amendments specifically define “state” to include “any city, county, district, public college or university, or other political subdivision or government instrumentality of or within the state.” Individual Petitions § 6; Omnibus Petition § 7. If extended to their logical extreme, the proposed amendments will bar school districts from sponsoring programs developed solely for the benefit of minorities, public, universities from either maintaining educational programs tailored specifically for minority students or recruiting minorities with minority scholarships, and city governments from considering race when hiring and assigning police officers to various precincts and neighborhoods. Thus, the proposed amendments’ substantial effect on local government entities, coupled with its curtailment of the powers of the legislative and judicial branches, renders it fatally defective and violative of the single-subject requirement. It is precisely this sort of “cataclysmic change” that the drafters of the single-subject rule labored to prevent.
Nevertheless, FCRI maintains that the proposed degree of specificity imposes hy-pertechnical burdens on citizens’ constitutional right to place proposed amendments on the ballot. While citizens have the right to amend the constitution by the methods provided, the citizens have recognized that the power to do so should not be unbridled. As we noted in Evans:
We recognize that all power ... comes from the people and that the citizens of the state have retained the right to broaden or to restrict that power by initiative amendment. But where such an initiative performs the functions of different branches of government, it clearly fails the functional test for the single-subject limitation the people have incorporated into article XI, section 3, Florida Constitution.
457 So.2d at 1354. Thus, while purely speculative consequences, such as the possibility that the Legislature could pass a law abridging existing constitutional rights, see In re Advisory Opinion to the Attorney General: English—The Official Language of Florida, 520 So.2d 11, 12 (Fla.1988), are not germane to this Court’s determination, identifiable changes in the functions of different levels and branches of government are sufficient to warrant invalidating the amendments.

BALLOT TITLES AND SUMMARIES

The Attorney General and opponents assert that the ballot titles and summaries violate section 101.161, Florida Statutes, for several reasons. As previously mentioned, the ballot title and summaries must describe the chief purpose of the measure in clear and unambiguous language. See Right of Citizens to Choose Health Care Providers, 705 So.2d at 566. The Attorney General, CBSL, FREE, NBA, and Leadership Conference highlight the different terminology used in the ballot titles and summaries from the actual text of the proposed amendments. The ballot titles and summaries refer to “people”; however, the text of the proposed amendments refers to “persons.” They contend that use of the term “people” fails to give voters notice that corporations may also be prohibited from receiving preferential treatment. FCRI, however, submits that these contentions are without merit where the terms are virtually synonymous.
Opponents contend that the divergent terminology creates an ambiguity similar to that in Right of Citizens to Choose Health Care Providers. In that advisory opinion, we found a discrepancy between the term “citizens,” which was used in the ballot summary, and “every natural person,” which appeared in the text of the amendment. See 705 So.2d at 566. We concluded: “This discrepancy between ‘natural person’ and ‘citizens’ is material and misleading. This divergence in terminology is ambiguous in that it leaves voters guessing whether the terms are intended to be synonymous or whether the difference in terms was intentional.” Id. *897 Similarly, in People’s Property Rights Amendments, we invalidated a misleading petition, stating that the “summary refers to the owner of real property but does not define ‘owner.’ Consequently, the use of the term ‘people’ in the title ‘People’s Property Rights Amendments’ is confusing because it is unclear if ‘owner’ is restricted to people who own the property or also to corporate entities.” 699 So.2d at 1808-09. By like measure, in In re Advisory Opinion to the Attorney General re Casino Authorization, Taxation and Regulation, 656 So.2d 466, 468-69 (Fla.1995), we invalidated a petition because voters were not informed that the proposal’s use of different terminology was legally significant. In that advisory opinion, the summary used the term “hotel,” but the text of the proposed amendment used the term “transient lodging establishment.” Id. at 469. We noted that the legal definition for “transient lodging establishment” was much broader than that for “hotel,” and concluded:
Thus, while the summary leads the voters to believe that casinos will be operated only in “hotels,” the proposed amendment actually permits voters to authorize casinos in any number of facilities, including a bed and breakfast inn. We believe that the public perceives the term “hotel” to have a much narrower meaning than the term “transient lodging establishment.”
Id. In English — The Official Language of Florida, we also addressed differing terminology where the summary stated that the Legislature could “implement this article,” but the text stated that the Legislature had the power to “enforce this section.” 520 So.2d at 13. We, however, concluded that the two terms were synonymous and that voters could not reasonably be misled. See id.
As the opponents suggest, the divergent terminology creates a discrepancy as to whether the proposed amendments’ proscriptions apply to corporations. Although FCRI likens the difference in terminology to English — The Official Language of Florida, the different terms used in the present initiatives are more analogous to those used in Right of Citizens to Choose Health Care Providers, People’s Property Rights Amendments, and Casino Authorization, Taxation and Regulation. FCRI maintains that while the term “persons” is not defined, its contextual meaning is clear. Since corporations do not have “race, color, or ethnicity,” FCRI contends that the plain meaning of the amendments is that they apply to natural persons. However, the amendments’ proscriptions could extend to corporations based on the race of their ownership or racially-oriented purpose. Like the amendments in Right of Citizens to Choose Health Care Providers and People’s Property Rights Amendments, it is unclear to the voter whether the difference in terms was intentional and how corporations will be affected. As in Casino Authorization, Taxation and Regulation, the petitions do not account for the legal significance of using the term “person,” thereby failing to inform voters of the potential breadth of the proposed amendments. Contrary to the inconsistent terminology used in this case, the terms used in English — The Official Language of Florida — legislative implementation and enforcement — were virtually synonymous. While “people” and “person” also appear synonymous, their legal differences are significant and are not revealed to the voter. In addition, FCRI points out that the scope of the amendment is, however, broad enough to apply where governmental action attempts to authorize or endorse the use of the corporate form to circumvent the prohibition of discrimination as to race, color, ethnicity, or national origin. This distinction is also not clearly explained to the voters. As we noted in Restricts Laws Related to Discrimination, “[t]he omission of such material information is misleading and precludes voters from being able to cast their ballots intelligently.” 632 So.2d at 1021.
*898 Further, the Attorney General, FREE, Board of Regents, and Leadership Conference contend that the ballot titles and summaries do not identify the constitutional and statutory provisions that the proposed amendments will affect. In Advisory Opinion to the Attorney General Re Stop Early Release of Prisoners, 642 So.2d 724, 726 (Fla.1994), we invalidated a petition because it substantially modified another constitutional provision but did not mention this consequence in the ballot summary. As previously discussed, the proposed amendments substantially affect article I, section 2, and article I, section 21. However, the ballot summaries do not describe this effect. Consequently, the ballot summaries are defective for not identifying the initiative petitions’ effect on these existing constitutional provisions.
In a similar vein, the Attorney General, CBSL, and Board of Regents contend that the ballot titles and summaries imply that there currently is no such constitutional provision barring discrimination based on the enumerated classifications. In Tax Limitation I, we held that the ballot title and summary were misleading because they implied that there was no existing cap or limitation on taxes in the constitution when, in fact, such a limitation existed. See 644 So.2d at 494. Similarly, in Casino Authorization, Taxation and Regulation, we invalidated a petition because the ballot summary implied that the amendment was necessary to prohibit casinos in the state. See 656 So.2d at 469. We noted that the first line of the summary, “This amendment prohibits casinos unless approved by the voters,” created the false impression that casinos were presently allowed in the state. Id. Consequently, we held that the ballot summary was defective because of what it failed to say. See id.
The ballot titles in the present case state: “AMENDMENT TO BAR GOVERNMENT FROM TREATING PEOPLE DIFFERENTLY BASED ON RACE IN PUBLIC EDUCATION [EMPLOYMENT] [CONTRACTING] ” and “END GOVERNMENTAL DISCRIMINATION AND PREFERENCES AMENDMENT.” As in Tax Limitation I and Casino Authorization, Taxation and Regulation, the ballot titles imply that there is no provision addressing differential treatment for the enumerated classifications. However, article I, section 2, prohibits deprivation of rights based on race, religion, national origin, or physical disability. See art. I, § 2, Fla. Const. As this Court has noted with other initiatives, the problem “lies not with what the summary says, but, rather, with what it does not say.” Term Limits Pledge, 718 So.2d at 804 (quoting Askew, 421 So.2d at 156). Consequently, the ballot titles are defective because of the misleading negative implication that no such constitutional provision addressing differential treatment currently exists, and for the negative implication that the government is presently practicing discrimination.
The Leadership Conference contends that the omnibus summary’s reference to “bona fide qualifications based on sex” does not accurately explain what the proposed amendment provides. It notes that a voter has no basis for knowing the meaning of an “otherwise lawful classification.” It contends that voters could construe “bona fide qualifications based on sex” very broadly or narrowly, without knowing of the limitations provided in the initiative.
This Court addressed the problem of including ambiguous and undefined terms in ballot summaries in People’s Property Rights Amendments. In that advisory opinion, we held that the ballot summary was defective because, among other things, it failed to define the term “common law nuisance,” leaving voters unaware of what restrictions would be compensable under the proposed amendment. See 699 So.2d at 1309. Similarly, we invalidated another petition because the ballot summary’s definition of new tax as “increases in tax rates” did not distinguish between an increase in the amount of payments on taxable property or an increase in the actual *899 rate at which the property was being taxed. See id. at 1311. We also vigorously enforced the “clear and unambiguous” requirement in Smith v. American Airlines, Inc., 606 So.2d 618 (Fla.1992), noting that “the ballot summary here is [not] written clearly enough for even the more educated voters to understand its chief purpose. The summary not only assumes an extensive understanding of [the topic], but also requires the voter to infer a meaning which is nowhere evident on the face of the summary itself.”
Like the summaries in People’s Property Rights Amendments and Smith, the omnibus ballot summary’s general reference to the bona fide qualification exception is inadequate. The omnibus petition provides:
This section does not affect any otherwise lawful classification that: (a) Is based on sex and is necessary for sexual privacy or medical or psychological treatment; or (b) Is necessary for undercover law enforcement or for film, video, audio, or theatrical casting; or (c) Provides for separate athletic teams for each sex.
Omnibus Petition § 4. The summary states: “Exempts bona fide qualifications based on sex....” Omnibus Petition Summary. The term is not defined, leaving voters to guess at its meaning. Moreover, like the term “common law nuisance” in People’s Property Rights Amendments, “bona fide qualification based on sex” is a legal phrase, and voters are not informed of its legal significance. Certainly, the bare mention of a bona fide qualification exception does not inform voters of the concerns regarding sexual privacy, medical treatment, law enforcement, theatrical casting, or sports. Like the defective ballot summary in Smith, voters would undoubtedly rely on their own conceptions of what constitutes a bona fide qualification. Thus, the omnibus petition’s summary is vague and ambiguous, thereby violating section 101.161, Florida Statutes.
In a general rebuttal to the foregoing arguments, FCRI asserts that this Court has recognized that the summary is required only to state the “chief purpose of the measure” and that the statutory seventy-five word limit neither permits nor requires the inclusion or explanation of such detail, limitations, or anticipated ramifications. To be sure, we noted in Advisory Opinion to the Attorney General re Limited Casinos, 644 So.2d 71 (Fla.1994) that “[t]he seventy-five word limit placed on the ballot summary as required by statute does not lend itself to an explanation of all of a proposed amendment’s details.” 644 So.2d at 75. Similarly, in Grose v. Firestone, 422 So.2d 303, 305 (Fla.1982), we recognized that an exhaustive explanation of the interpretation and future possible effects of the amendment was not required. Consistent with this approach, we recognized in Prohibiting Public Funding of Political Candidates that the ballot title and summary “need not explain every detail or ramification of the proposed amendment.” 693 So.2d at 975. Despite the foregoing observations, we have stated:
[W]e have never required that the summary explain the complete details of a proposal at great and undue length, nor do we do so now. However, the word limit does not give drafters of proposed amendments leave to ignore the importance of the ballot summary and to provide an abbreviated, ambiguous statement in the hope that this Court’s reluctance to remove issues from the ballot will prevent us from insisting on clarity and meaningful information.
Smith, 606 So.2d at 621. Thus, drafters of proposed amendments cannot circumvent the requirements of section 101.161, Florida Statutes, by cursorily contending that the summary need not be exhaustive. Although significant detail regarding implementation and speculative scenarios may be omitted, this Court has repeatedly held that ballot summaries which do not adequately define terms, use inconsistent terminology, fail to mention constitutional provisions that are affected, and do not adequately describe the general operation *900 of the proposed amendment must be invalidated. That being the case, the challenges in the present case are not anomalous in that they require the summaries to contain sufficient detail. Rather, they are representative of the types of information that this Court has previously determined must be included in ballot summaries to ensure that voters are not misled. In short, the summaries are misleading and, therefore, violate section 101.161, Florida Statutes.
In invalidating the four proposed amendments, we find Justice Kogan’s concurrence in Restricts Laws Related to Discrimination instructive:
I reach this conclusion only because of the present initiative’s overbroad and unstated effects. I do not believe the Constitution forbids the people to propose limited initiatives that either broaden or restrict civil rights. What the Constitution does require is that all such civil rights initiatives must be narrowly framed, must not involve undisclosed collateral effects, and must not have the potential to disrupt other aspects of Florida law or government beyond the subject of the amendment itself. When such overbreadth exists, the single-subject requirement necessarily is violated; and the ballot-summary requirement is violated to the extent the initiative does not or cannot explain its own domino effect.
632 So.2d at 1024 (Kogan, J., concurring). Accordingly, we hold that the four proposed amendments should be stricken from the ballot for failure to comply with article XI, section 3, of the Florida Constitution and section 101.161, Florida Statutes.
It is so ordered.
HARDING, PARIENTE and QUINCE, JJ., concur.
SHAW, J., concurs in result only with an opinion.
WELLS, C.J., and ANSTEAD and LEWIS, JJ., concur in result only.

. Article XI, section 3, which vests the power to propose a revision or amendment in the people, provides, in relevant part:
It [the power] may be invoked by filing with the secretary of state a petition containing a copy of the proposed revision or amend *889 ment, signed by a number of electors in each of one half of the congressional districts of the state, and of the state as a whole, equal to eight percent of the votes cast in each of such districts, respectively and in the state as a whole in the last preceding election in which presidential electors were chosen.
Art. XI, § 3, Fla. Const.

. Section 15.21, Florida Statutes, requires the Secretary of State to submit the initiative petition to the Attorney General if the sponsor has registered as a political action committee, submitted the proposed amendment to the Secretary of State, and obtained a letter from the Division of Elections stating that the sponsor has received verification that it has collected the requisite number of signatures. See § 15.21, Fla.Stat. (1999).

. Section 16.061, Florida Statutes, provides, in pertinent part:
The Attorney General shall, within 30 days after receipt of a proposed revision or amendment to the State Constitution by initiative petition from the Secretary of State, petition the Supreme Court, requesting an advisory opinion regarding the compliance of the text of the proposed amendment or revision with s. 3, Art. XI of the State Constitution and the compliance of the proposed ballot title and substance with s. 101.161.
§ 16.061, Fla.Stat. (1999).

. In addition to a citizen initiative, amendments may be proposed by the Florida Legislature (article XI, section 1), by a constitutional convention (article XI, section 4), by a constitution revision commission (article XI, section 2), and by a taxation and budget reform commission (article XI, section 6).

. The classifications used in the Restricts Laws Related to Discrimination amendment were race, color, religion, sex, national origin, age, handicap, ethnic background, marital status, and familial status. Restricts Laws Related to Discrimination, 632 So.2d at 1019.

. Subsequent to our decision in Tax Limitation I, voters approved a constitutional amendment exempting proposals limiting the power of government to raise revenue from the single-subject requirement. See Advisory Opinion to the Attorney General re Tax Limitation, 673 So.2d 864, 865-66 (Fla.1996)(r<w: Limitation II ). The initiative petition we struck down in Tax Limitation I fell within this exemption. See id. Consequently, the Attorney General resubmitted the petition for review by this Court. See id. at 865. In accordance with the new constitutional provision, we addressed only the ballot summary and title requirements. See id. at 866.